UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FINDTHEBEST.COM, INC.;<br><br>           Plaintiff,<br><br>v.<br><br>LUMEN VIEW TECHNOLOGY LLC;<br>DALTON SENTRY, LLC;<br>DECISIONSORTER, LLC; THE HILLCREST<br>GROUP, INC.; EILEEN C. SHAPIRO;<br>STEVEN J. MINTZ; and DOES 1 through 50,<br><br>           Defendants. | No.  13 CV 6521<br><br>ECF CASE<br><br>FINDTHEBEST.COM, INC'S FIRST<br>AMENDED COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF FINDTHEBEST.COM, INC.'S FIRST AMENDED COMPLAINT

Plaintiff FindTheBest.com, Inc. ("FTB" or "Plaintiff") alleges the following claims against Defendants Lumen View Technology LLC ("Lumen"), Dalton Sentry, LLC ("Dalton"), DecisionSorter, LLC ("DecisionSorter"), Hillcrest Group, Inc. ("Hillcrest"), Eileen C. Shapiro ("Shapiro"), Steven J. Mintz ("Mintz"), and DOES 1 through 50 (collectively "Defendants"):

### NATURE OF THIS ACTION

1.     This is a civil action brought under the Federal Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.* "RICO") and state laws, including abuse of process, malicious prosecution, extortion, and violation of Cal. Bus. & Prof. Code § 17200,

against Defendants based on their association together for the common purpose of extorting money out of individuals and entities, including FTB, based on false, objectively unreasonable, and baseless claims of patent infringement.  Defendants entered into agreements with one another and formed a series of "shell" entities for the purpose of filing frivolous patent infringement actions and extorting "licensing fees" or settlements from FTB and others, who are the target of those baseless infringement claims.   Defendants advance their patent infringement claims knowing that their targets are not infringing the patent.  In fact, of all of the patent infringement lawsuits filed by Defendants, through Lumen, Defendants know that not a single target infringes the patent.

2.      Defendants are the holders, licensors, licensees, assignors, or assignees of patents covering abstract, fundamental, business-related concepts that they do not use in any of their own commercial enterprises.  Rather, Defendants bring serial lawsuits based on alleged infringement of these patents by legitimate businesses, like FTB, that use similar fundamental business-related concepts (but not the same concepts), even though they do not actually infringe any claims of Defendants' patents.

3.      At all times Defendants know that the targets of their lawsuits are not infringing their patents and have not done proper due diligence and investigation; however, they use the legal process and the threat of huge legal expenses associated with defending a patent infringement lawsuit, threats of criminal prosecution, threats of disruption to the target's business, and threats of public embarrassment to extort "licensing fees" or settlements from their victims in exchange for a dismissal of the frivolous patent infringement lawsuit.  Defendants do so knowing that the cost of fighting their patent infringement lawsuits and the disruption to the

target's business are more exorbitant and costly than the "licensing fees" or settlement Defendants extort.

4.      Defendants create multiple layers of "shell entities" so that their victims have little chance (and therefore little incentive) to recover any monetary relief as a result of Defendants' conduct.  These "shell entities" are undercapitalized, do not operate any legitimate business, and do not have any actual offices.  As such, these "shell entities" avoid numerous burdens of litigation – *e.g.* the disruption to business and the expense of compiling discovery responses – which they inflict on their victims.

5.      Defendants have continuously engaged in this pattern and practice of filing false claims and using such threats to harass, annoy and intimidate their victims into paying "licensing fees" or settlements to which Defendants are not entitled.  Since their formation of Lumen 18 months ago, Defendants have filed more than 20 patent infringement lawsuits based on the same patent they allege FTB infringes, the majority of which were dismissed with prejudice after Lumen (in accordance with its agreement with the other Defendants) extorted "licensing fees" or settlements from those defendants.  Defendants have asserted many more patent infringement claims using different shell entities and patents apparently related to the patent it alleged against FTB.

## PARTIES

6.      FTB is a Delaware corporation with its principal place of business located at 101 Innovation Place, #A, Santa Barbara, California 93108.

7.      Eileen C. Shapiro is a resident of Massachusetts and is listed as the co-inventor of United States Patent No. 8,069,073 ("the '073 Patent"), the patent referenced in Lumen's Complaint in Case No. 13 CV 3599 (Doc. No. 1) pending in this Court.

8.      Steven J. Mintz is a resident of Saddle River, New Jersey, and is listed as the co-inventor of the '073 Patent.  Mintz is a managing member of DecisionSorter.

9.      Hillcrest is a Massachusetts Corporation formed by Shapiro and Mintz for the purpose of carrying out the racketeering activity described herein, to hide their involvement in the extortion of "licensing fees" and settlements from their victims and the public, and to avoid the expense and burden of litigation.  On information and belief, Shapiro is the President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary, and Director of Hillcrest.

10.     On information and belief, Hillcrest is a manager of DecisionSorter and many other "shell entities" created by Shapiro and Mintz.

11.     DecisionSorter is a Massachusetts Limited Liability Company formed by Shapiro and Mintz for the purpose of carrying out the racketeering activity described herein, to hide their involvement in the extortion of "licensing fees" and settlements from their victims and the public, and to avoid the expense and burden of litigation.  DecisionSorter's registered agent for service of process is Hillcrest located at 20 University Road, Cambridge, MA 02138.  DecisionSorter was the original assignee of the '073 Patent.

12.     On information and belief, FTB alleges that DecisionSorter has no actual business address or business office because it conducts no legitimate business and has no business operations.  DecisionSorter is a non-practicing entity, meaning that it does not research and develop new technology but, rather, acquires patents and licenses the technology for the purpose of filing patent infringement lawsuits and improperly extorting "licensing fees" and settlements.

13.     Dalton is a Delaware Limited Liability Company formed by Shapiro and Mintz for the purpose of carrying out the racketeering activity described herein, to hide their involvement in the extortion of "licensing fees" and settlements from their victims and the

public, and to avoid the expense and burden of litigation.  Dalton's registered agent for service of process is located at 2711 Centerville Rd., Suite 400, Wilmington, DE 19808.

14.      On information and belief, FTB alleges that Dalton has no actual business address or business office because it conducts no legitimate business and has no business operations. Dalton is a non-practicing entity, meaning that it does not research and develop new technology but, rather, acquires patents and licenses the technology for the purpose of filing patent infringement lawsuits and improperly extorting "licensing fees" and settlements.

15.      On or about September 29, 2010, DecisionSorter purported to assign its rights to the '073 Patent to Dalton.

16.      Lumen is a Delaware Limited Liability Company formed by Shapiro and Mintz for the purpose of carrying out the racketeering activity described herein, to hide their involvement in the extortion of "licensing fees" and settlements from their victims and the public, and to avoid the expense and burden of litigation.  Lumen's registered agent for service of process is located at 113 Barksdale Professional Center, Newark, DE, 19711.

17.      On information and belief, FTB alleges that Lumen has no actual business address or business office because it conducts no legitimate business and has no business operations. Lumen is a non-practicing entity, meaning that it does not research and develop new technology but, rather, acquires patents and licenses the technology for the purpose of filing patent infringement lawsuits and improperly extorting "licensing fees" and settlements.  On information and belief, Lumen is a shell entity with no ostensible purpose, assets or operation other than as serving as a medium for Shapiro and Mintz to conduct their criminal enterprise.

18.     On or about March 1, 2012, Dalton purported to assign its rights to the '073 Patent to Lumen.  On information and belief, the purpose of this assignment was to enable Lumen to file frivolous patent infringement lawsuits against FTB and others.

19.     Lumen now claims to be the exclusive licensee of the '073 Patent.  FTB alleges on information and belief, however, that Shapiro and Mintz still hold an economic interest in the '073 Patent and benefit from the herein alleged illegal enterprise.

20.     Shapiro and Mintz are the individuals directing the affairs of Lumen, DecisionSorter, Dalton, and Hillcrest through a pattern of improper tortious acts and illegal conduct described in this Complaint, which cause financial harm to FTB and others.

21.     Lumen, DecisionSorter, Dalton, Hillcrest, Shapiro, and Mintz have engaged in a pattern of racketeering activity, have each committed numerous criminal acts as part of their scheme to defraud and extort FTB, and others, and have each participated in the operation or management of the criminal enterprise.

22.     At all times, the Defendants were and are acting in concert with one another, in accordance with their agreement, with a common purpose of carrying out the illegal enterprise and tortious acts described herein.

23.     At all times, Defendants were aiding and abetting one another in that, for each alleged predicate act described herein, each Defendant was associated with the wrongful conduct, participated in that conduct with the intent to bring it about, and sought by their actions to make it succeed.

24.     Alternatively, FTB alleges that Defendants operate as a single economic unit and are so dominated by the will of Shapiro and Mintz, and are used not to transact lawful business

but to commit extortion and other illegal acts for the benefit of Shapiro and Mintz, that they cease to be separate units and are, in fact, the alter ego of Shapiro and Mintz.

25.     Because Defendants do not engage in the legal discovery process in good faith, FTB, at this time, is unable to ascertain the extent of Shaprio and Mintz's direction of the remaining Defendants.

26.     Defendants DOES 1-50, inclusive, are individuals and entities not yet known to Plaintiff because Defendants have concealed their identity through a series of shell entities or otherwise.   Once their identities are ascertained, the names of those individuals will be substituted in place of DOE designations.

<u>**JURISDICTION AND VENUE**</u>

27.     This Court has subject matter jurisdiction over FTB's claims under 28 U.S.C. § 1331 and under the RICO Act, 18 U.S.C. §§ 1961 *et seq.*   This Court has supplemental jurisdiction over FTB's other claims pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District and under 18 U.S.C. § 1965.

29.     This Court may exercise personal jurisdiction over Lumen because Lumen consented to the personal jurisdiction of this Court by filing a complaint against FTB in this Court.  All Defendants have purposefully availed themselves of the laws and protections of New York by filing or causing to be filed multiple patent infringement lawsuits in this district and by abusing the process of the New York courts to cause harm to FTB (and others) as further alleged herein.  The Court may assert personal jurisdiction over the other Defendants pursuant to 18

U.S.C. § 1965 and because Defendants used the process of this Court to attempt to extort money from FTB and carry-out its illegal enterprise.

<div align="center"><b><u>FACTUAL BASIS FOR CLAIMS</u></b></div>

**A.      Defendants Rely on the '073 Patent to Conduct Their Scheme.**

30.      On November 29, 2011, the United States Patent and Trademark Office ("USPTO") issued Patent No. 8,069,073 (the "073 Patent") entitled, "System and Method For Facilitating Bilateral And Multilateral Decision-Making."   A copy of this Patent is attached hereto as Exhibit A.

31.      Lumen contends that the '073 Patent covers the computer enabled decision making process of matching two-party or multi-party preferences.  More specifically, the patent purportedly covers a computer-implemented, multi-step process for decision making in a transaction, whereby two or more people provide responses to questions designed to reveal the value a party places on certain attributes, creating a "preference profile" for each respondent, which is then analyzed and matched against other parties' preference profiles to output a list that ranks how closely the party's preference profile matches those of other parties.

a.      Importantly, the patent covers only circumstances where **two or more preference profiles are created and analyzed** ("bilateral and multilateral decision-making"); *e.g.*, it does not cover circumstances where **one** individual provides responses and only one preference profile is created ("unilateral decision-making") even if that preference profile is compared to attributes of another party.  This is a crucial distinction that the '073 Patent uses to distinguish its method from prior art:  "Since the embodiment uses a preference profile *for both parties and counterparties* to evaluate the closeness of fit of preferences, it is a bilateral preference analysis method as opposed to the unilateral

<div align="center">8.</div>

methods of the prior art."  (Exh. A, 4:48-52 [emphasis added] [explaining the method depicted in Fig. 2].)[1]

      b.     These "preference profiles" are determined by supplying a "series of forced choice questions" to at least two parties and analyzing both parties' responses to those questions:  "The method involves supplying to at least one of the parties a series of forced choice questions so as to elicit party responses; supplying to at least one of the counterparties a series of forced choice questions so as to elicit counterparty responses; and delivering a list matching the at least one party and the at least one counterparty according to analysis of preference profiles determined using conjoint analysis of the party responses and the counterparty responses."  (Exh. A, 1:59-63; accord 2:1-29 [describing all alternative embodiments as using responses to forced choice questions of at least two parties]; see also Figs. 1-5.)  Thus the '073 Patent does not purport to cover methods for facilitating decision-making that do not use "forced choice questions."[2]

      c.     The computer program analyzes each party's preference profile using a conjoint analysis or forced-choice methodology to provide the best statistical match. (Exh. A, Abstract [the technique involves "performing multilateral analysis of the combined preference data by computing closeness-of-fit value"]; 4:18-19, 9:5-10:18 [explaining the aggregate value method and distance value method used to determine

---

[1] See Exh A, 4:11-5 [explaining the method depicted in Fig. 1 of generating two preference profiles based on each party's response to forced choice questions]; 13:32-25 [explaining the method depicted in Fig. 3, whereby a preference profile is "generated for each party"; 15:56-63 [explaining the method creates preference profiles for *each* party "using the party's answers to preference form questions"].)

[2] The '073 Patent details at length the importance of using "forced choice questions," discussing "the nature of suitable questions" (Exh. A, 4:8; 6:5-8 [questions asked to each party commonly "mirror" or "complement" one another], and warning that "[p]roper design of the questions permits statistical evaluation of the response, from which may be derived utility values for each respondent."  (Exh. A, 6:40-42.)

"closest fit" based on the "utility function" determined by each party's responses].)  In fact, in prosecuting the patent and distinguishing the claims from prior art, the inventors represented to the USPTO "that the claims require that conjoint analysis be applied to both sides in a matching situation…."  This was distinct from the prior art, which disclosed unilateral conjoint analysis.  The inventors made this representation to avoid a determination that the invention was obvious and non-patentable.  Thus, the process does not involve merely matching responses based on "key word" searches, but requires a statistical analysis of each party's responses to determine "the utility value that each respondent places on the possible level of a set attributes" and then matching those utility values to determine "closest fit."  (Exh. A, 4:55-57; 5:6-9, 5:31-34, 5:44-47; 6:40-43 ["Proper design of the questions permits statistical evaluation of the responses, from which may be derived utility values for each respondent."].)

        d.     Because the patented process requires a determination of utility value, the responding parties must assign some sort of value or otherwise rank their responses to the forced choice questions so that the computer can determine "the utility value that each respondent places on the possible level of a set attributes."  (Exh. A, 4:55-57.) [3] Accordingly, the '073 Patent does not apply to methods of matching party preferences where the parties do not rank or assign value to their choices.

32.    Based on the foregoing, the '073 Patent does not apply to the following four situations: (1) where a preference profile for only one party is created from forced choice

---

[3] This is but another way the '073 Patent distinguishes its method from prior art: "Here...the responses of each party (and counterparty) are typically analyzed separately, so that for each party and each counterparty there is obtained a separate set of utility functions. ... [C]onventional methods produce utility functions in a one-sided, or unilateral, fashion."  (Exh. A, 8:17-22; see 1:48-49 ["Conventional techniques" may be called "unilateral, or one-sided, evaluation techniques."].)

questions; (2) where preference profiles are not created in response to forced choice questions; (3) where a conjoint analysis/statistical analysis is not applied to two or more preference profiles; and (4) where the parties do not rank or set a value to their responses to forced choice questions.

33.     Lumen claims to be the exclusive licensee of the '073 Patent.  However, FTB alleges, on information and belief, that Shapiro and Mintz still have an economic interest in the '073 Patent and financially benefit from the illegal acts described herein.  In fact, Lumen's current attorney made such a representation.

34.     On information and belief, Shapiro and Mintz formed Lumen for the purpose of extorting money from targets based on the '073 Patent.  Specifically, Lumen was formed on February 23, 2012.  The '073 Patent was assigned to Lumen on March 1, 2012.  Lumen filed its first of more than 20 patent infringement lawsuits eight days later on March 9, 2012 (*Lumen View Technology, LLC v. Avotus, Inc.*, Case No. 12-CV-00291 (D.Del. 2012)).  In the following 16 months, Lumen filed more than 20 patent infringement lawsuits claiming infringement of the '073 Patent, all of which target companies that Defendants know do not infringe the '073 Patent.

**B.     Defendants' Pattern and Practice of Extorting Money From Its Targets.**

35.     Using Lumen, Defendants have engaged in a pattern and practice of making frivolous patent infringement claims and filing lawsuits for the sole purpose of extorting "licensing fees."  Defendants file these lawsuits without conducting a pre-lawsuit investigation and knowing that the targets are not actually infringing the '073 Patent.  In all of these cases, it is obvious that the target is not infringing the '073 Patent.  In each and every case, publicly available information indicates that the targets do not infringe the '073 Patent because they either: (1) use only one party's preference profile created from forced choice questions; (2) do not create any party preference profiles in response to forced choice questions; (3) do not apply a

11.

conjoint analysis/statistical analysis to two or more preference profiles; or (4) do not ask parties to rank or set a value to their preferences.  Nonetheless, Defendants file these lawsuits because they know the cost of fighting the frivolous patent infringement lawsuit is more than paying a "licensing fee" and, therefore, the targets will opt to pay the "license fee" over fighting the lawsuit.

36.     Defendants' continuous pattern and practice is demonstrated by the following acts, all of which follow the same general pattern:

a.     *Lumen View Technology LLC v. Avotus Inc.*, Case No. 1:2012-cv-00291 (D.Del 2012).  Avotus is a provider of "Communication Lifecycle Management" (CLM) solutions.    Avotus provides telecommunication management solutions that help enterprises tackle challenges associated with managing their communications assets and services.  Avotus does not provide any products or services that match preferences, much less bilateral or multilateral preferences.  It does not create party preference profiles from forced choice questions.

i.   On or about March 9, 2012, Lumen sent Avotus a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Avotus was infringing the '073 Patent.  The letter further demanded that Avotus pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Avotus was not actually infringing the '073 Patent.

ii.  Lumen granted Avotus three extensions of time to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Avotus.  Lumen did so because it did not want Avotus to challenge its pleading and expose its frivolous claims. Lumen did not believe it could prevail on the merits of the lawsuit.

iii.  On information and belief, Avotus ultimately decided to pay the "license fee" demanded by Lumen, even though it was not infringing the '073 Patent, because the "license fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur from the business disruption that would result from fighting Lumen's claims.  On information and belief, Avotus paid defendants the extorted payment on or about July 13, 2012.

iv.  This lawsuit was voluntarily dismissed with prejudice by Lumen.

b.  *Lumen View Technology LLC v. Education Dynamics LLC et al.*, Case No. 1:2012-cv-00321 (D.Del. 2012).  Education Dynamics LLC ("ED") offers services to educational providers to facilitate the growth of their enrollment bases.  ED's goal is to attract, engage and retain the best prospective students for each institution.  ED primarily does so by utilizing websites that request prospective students to enter their preferences when searching for an educational provider.  ED then analyzes the data and connects them with the schools that are best suited to their individual needs.  Only one person (a student) answers forced choice questions and a preference profile is created only for one

party (the student).  Thus, ED does not use multilateral decision-making or a statistical evaluation of two parties' preference profiles.

      i. On or about March 15, 2012, Lumen sent ED a demand letter by fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that ED was infringing the '073 Patent.  The letter further demanded that ED pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that ED was not actually infringing the '073 Patent.

      ii. On information and belief, ED decided to pay the "license fee" demanded by Lumen, even though it was not infringing the '073 Patent, because the "license fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur from the business disruption caused by fighting Lumen's claims.  On information and belief, ED paid defendants the extorted payment on or about July 9, 2012.

      iii. This lawsuit was voluntarily dismissed with prejudice by Lumen.

    c. *Lumen View Technology LLC v. Zimride Inc.*, Case No. 1:2012-cv-00378 (D.Del. 2012).  Zimride connects inter-city drivers and passengers through social networking.  Passengers looking to find rides can search for drivers willing to share their vehicles.  Only one party (passengers) enters its preferences and the available rides appear.  Drivers only enter data; they do not answer "force choice questions" and they do

not rank the data they enter, therefore, no "preference profile" is created for drivers. Accordingly, Zimride does not apply a conjoint analysis to two preference profiles.

i. On or about March 26, 2012, Lumen sent Zimride a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Zimride was infringing the '073 Patent. The letter further demanded that Zimride pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause. All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Zimride was not actually infringing the '073 Patent.

ii. On information and belief, Zimride decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent, because the "licensing fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur as a result of the business disruption caused by fighting Lumen's claims. On information and belief, Zimride paid defendants the extorted payment on or about April 23, 2012.

iii. This lawsuit was voluntarily dismissed with prejudice by Lumen.

d. *Lumen View Technology LLC v. Catchafire Inc.*, Case No. 1:2012-cv-00506 (D.Del. 2012). Catchafire matches professionals who wish to volunteer their skills with organizations that need their help. Organizations, including both nonprofits and for profit companies, identify projects that require volunteer assistance and then provide a description to Catchafire. This description is not based on forced choice questions and is

15.

not a preference profile within the meaning of the '073 Patent.  Professionals can search for a project that suits their skills and interests.  Professionals can narrow down projects that interest them by checking various boxes that filter by expertise, cause, and location. As only the professionals can provide "preferences," the program involves only unilateral decision-making; it does not apply a conjoint analysis to two preference profiles.  Neither party ranks or assigns any value to their preferences so that a "utility value" can be determined to deliver a "closeness-of-fit value."

    i. On or about April 20, 2012, Lumen sent Catchafire a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent falsely stating that Catchafire was infringing the '073 Patent.  The letter further demanded that Catchafire pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Catchafire was not actually infringing the '073 Patent.

   ii. Lumen granted Catchafire three extensions of time to file a responsive pleading; one extension was given after Catchafire failed to file a timely response.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Catchafire.  Lumen did so because it did not want Catchafire to challenge its pleading and expose its frivolous claims.

iii. On information and belief, Catchafire decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent, because the "licensing fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur as a result of the business disruption caused by fighting Lumen's claim. On information and belief, Catchafire paid defendants the extorted payment on or about July 13, 2012.

iv. This lawsuit was voluntarily dismissed with prejudice by Lumen.

e. *Lumen View Technology LLC v. CollegeBound Network LLC*, Case No. 1:2012-cv-00593 (D.Del. 2012). CollegeBound Network (CBN) specializes in recruitment lead generation solutions for educational institutions using websites, robust content, a Student Services division, various social media platforms, daily blogs, and other advertising mediums. CBN allows students to enter preferences and then matches those preferences with publically available information regarding education institutions. In return, CBN obtains student contact information and passes that information along to educational providers who can use those leads for target marketing. The prospective students are the only party entering preference data, but do not rank or assign value to those preferences. No preference profile is created for the educational institutions using forced choice questions and no conjoint analysis is applied to two preference profiles.

i. On or about May 11, 2012, Lumen sent CBN a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that CBN was infringing the '073 Patent. The letter further demanded that CBN pay a "license fee" and detailed the high cost and

17.

substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that CBN was not actually infringing the '073 Patent.

ii.  On information and belief, CBN decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent, because the "licensing fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur as a result of the business disruption caused by fighting Lumen's claims.  On information and belief, CBN paid defendants the extorted payment on or about August 6, 2012.

iii.  This lawsuit was voluntarily dismissed with prejudice by Lumen.

f.    *Lumen View Technology LLC v. Mom Corps Services LLC*, Case No. 1:2012-cv-00625 (D.Del. 2012).  Mom Corps Services LLC ("Mom Corps") matches professional women seeking employment with employers looking for experienced employees.  Employers post a description of their job openings.  Applicants can search the job database for flexible job opportunities.  Employers do not answer a series of forced choice questions and do not rank responses to such questions.  Applicants may modify search fields (*e.g.* by keyword, field of expertise, or job location) to filter employer posts.  Thus, the program does not apply a conjoint analysis to two preference profiles to deliver a "closeness-of-fit value."

i.  On or about May 18, 2012, Lumen sent Mom Corps a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Mom Corps was infringing the '073 Patent.  The letter

further demanded that Mom Corps pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Mom Corps was not actually infringing the '073 Patent.

    ii.   On information and belief, Lumen thereafter learned that Mom Corp lacked sufficient funds to pay any "license fee" to Lumen.

   iii.   This lawsuit was voluntarily dismissed without prejudice by Lumen on June 18, 2012.  On information and belief, it was dismissed because Lumen decided it could not extort a "license fee" from Mom Corps and because Lumen had no desire to obtain an injunction preventing Mom Corps from engaging in the conduct Lumen alleged infringes the '073 Patent.  On information and belief, Lumen plans to re-file the lawsuit if and when Defendants are able to extort a payment from Mom Corps.

   g.   *Lumen View Technology LLC v. RealMatch Inc. et al*., Case No. 1:2012-cv-00724 (D.Del. 2012).  RealMatch helps employers recruit new employees using "Real Time Job Matching," a technology that allows employers and job seekers to specifically define themselves, their needs and their preferences.  The technology uses information entered by the users, as well as information found on their resumes, and the job description provided by employers to determine match level.  While the prospective employees enter information, the program only uses the job description to formulate a match.  There are no preferences or ranking entered by the employers and no responses by employers to forced choice questions that are used to create an employer preference

19.

profile.  Accordingly, RealMatch does not use two preference profiles and does not apply a conjoint analysis to two preference profiles.

    i.    On or about June 8, 2012, Lumen sent RealMatch a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that RealMatch was infringing the '073 Patent.  The letter further demanded that RealMatch pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that RealMatch was not actually infringing the '073 Patent.

    ii.    Lumen granted RealMatch six extensions of time (and nearly four additional months) to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from RealMatch.  Lumen did so because it did not want RealMatch to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

    iii.    RealMatch's CEO, Gal Almog, described Defendants as "terrorists" and stated that RealMatch was forced to settle with Lumen even though he was certain RealMatch did not infringe the '073 Patent because Lumen began naming RealMatch's clients, which substantially increased RealMatch's exposure to indemnification costs.  On information and belief, RealMatch paid defendants the extorted payment on or about July 17, 2012.

      iv.   This lawsuit was voluntarily dismissed with prejudice by Lumen.

h.      *Lumen View Technology LLC v. SnagAJob.com Inc. et al.*, Case No. 1:2012-cv-01178 (D.Del. 2012).  SnagAJob helps hourly workers find jobs and hourly employers find the best people for their jobs.  SnagAJob offers employers access to their pool of applicants.  It also provides hiring software that presents behavioral assessments and background checks of applicants.  On the other side, prospective applicants are provided with the opportunity to search employers' job posts by keyword and location. Employers do not answer forced choice questions, no employer preference profile is created, and SnagAJob does not apply a conjoint analysis to match the parties based on their preference profiles.

      i.   On or about September 20, 2012, Lumen sent SnagAJob a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that SnagAJob was infringing the '073 Patent.  The letter further demanded that SnagAJob pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that SnagAJob was not actually infringing the '073 Patent.

      ii.   Lumen granted SnagAJob four extensions of time (and nearly four additional months) to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from

        SnagAJob.  Lumen did so because it did not want SnagAJob to challenge its pleading and expose its frivolous claims.

    iii.    On information and belief, SnagAJob finally convinced Lumen that it was financially unable to pay a "license fee."

    iv.    This lawsuit was voluntarily dismissed without prejudice by Lumen on January 29, 2013. On information and belief, it was dismissed because Lumen decided it could not extort a "license fee" from SnagAJob and because Lumen had no desire to obtain an injunction preventing SnagAJob from engaging in the conduct Lumen alleged infringes the '073 Patent. On information and belief, Lumen plans to re-file the lawsuit if and when Defendants are able to extort a payment from SnagAJob.

    i.    *Lumen View Technology LLC v. Careerimp Inc.*, Case No. 1:2013-cv-00110 (D.Del 2012).  Careerimp, Inc. offers several websites with the stated intent "to make applying to jobs easier, more effective, and, believe it or not, even fun." Careerimp, Inc. does so by operating four websites: Resunate.com, ApplyApp.ly.com, MyCrappyResume.com, and TheRegionalInternshipCenter.com.  Resunate.com offers resume-tailoring services.  Prospective applicants pay to upload their resumes and a "parsing software extracts info from [the] resume and maps it to the employer's database, called an Applicant Tracking System (ATS)."  ApplyApp.ly.com uses their "innovative Semantic Intelligence Technology, which analyzes and compares resume and job descriptions content, beyond just keyword and job title similarity, to determine job matches."  MyCrappyResume.com is an entertainment site where "professional HR (mis) adventures" are shared.  TheRegionalInternshipCenter.com facilitates interaction between

employers and prospective employees.  Employers can post internship opportunities and prospective applicants can search for internships that provide the best fit.  None of these websites create preference profiles from forced choice questions or apply a conjoint analysis to two preference profiles to match employers with employees.  There is no ranking of preferences by either party from which a utility value can be determined.

    i. On or about January 18, 2013, Lumen sent Careerimp a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Careerimp was infringing the '073 Patent.  The letter further demanded that Careerimp pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Careerimp was not actually infringing the '073 Patent.

    ii. After Careerimp failed to file a timely response to the complaint, Lumen granted an extension of time to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Careerimp.  Lumen did so because it did not want Careerimp to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

    iii. On information and belief, Careerimp finally convinced Lumen that it was financially unable to pay a "license fee."

iv. This lawsuit was voluntarily dismissed without prejudice by Lumen on March 18, 2013. On information and belief, it was dismissed because Lumen decided it could not extort a "license fee" from Careerimp and because Lumen had no desire to obtain an injunction preventing Careerimp from engaging in the conduct Lumen alleged infringes the '073 Patent. On information and belief, Lumen plans to re-file the lawsuit if and when Defendants are able to extort a payment from Careerimp.

j.      *Lumen View Technology LLC v. Couchsurfing International Inc.*, Case No. 1:2013-cv-00171 (D.Del. 2013). Couchsurfing International, Inc. offers a service that connects members to a global community of travelers. Individuals can open their homes to travelers visiting their locales. Travelers can search for available "couches to surf" by looking through profiles and references of those people willing to open their homes. Couchsurfing does not used forced choice questions to create preference profiles and does not use a conjoint analysis to match two or more preference profiles.

i. On or about February 1, 2013, Lumen sent Couchsurfing a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Couchsurfing was infringing the '073 Patent. The letter further demanded that Couchsurfing pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause. All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Couchsurfing was not actually infringing the '073 Patent.

24.

ii. Lumen granted Couchsurfing two extensions of time to file a responsive pleading. On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Couchsurfing. Lumen did so because it did not want Couchsurfing to challenge its pleading and expose its frivolous claims. Lumen did not believe it could prevail on the merits of the lawsuit.

iii. This lawsuit was voluntarily dismissed without prejudice by Lumen on April 22, 2013. On information and belief, it was dismissed because Lumen decided it could not extort a "license fee" from Couchsurfing and because Lumen had no desire to obtain an injunction preventing Couchsurfing from engaging in the conduct Lumen alleged infringes the '073 Patent. On information and belief, Lumen plans to re-file the lawsuit if and when Defendants are able to extort a payment from Couchsurfing.

k. *Lumen View Technology LLC v. Bright Media Corporation*, Case No. 1:2013-cv-00244 (D.Del. 2013). Bright Media Corporation, Inc. ("Bright Media") operates Bright.com, which facilitates the job search process by comparing an applicant's resume to employer job posts and then presents a score from 1-100 (the higher the score, the better matched an applicant is for an available position) using cosine similarities, frequency analysis, synonym matching, pattern matching, and cluster analysis. Users are not matched based on their responses to forced choice questions, they do not rank their responses, and the program does not apply a conjoint analysis to two preference profiles.

i.   On or about February 15, 2013, Lumen sent Bright Media a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Bright Media was infringing the '073 Patent.  The letter further demanded that Bright Media pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Bright Media was not actually infringing the '073 Patent.

ii.   Lumen granted Bright Media an extension of time to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Bright Media.  Lumen did so because it did not want Bright Media to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

iii.   On information and belief, Bright Media decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent, because the "licensing fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur as a result of the business disruption caused by fighting Lumen's claims.   On information and belief, Bright Mdia paid defendants the extorted payment on or about April 16, 2013.

iv.   This lawsuit was voluntarily dismissed with prejudice by Lumen.

l.      *Lumen View Technology LLC v. InternMatch Inc.*, Case No. 1:2013-cv-00310 (D.Del. 2013.)   InternMatch, Inc. connects prospective interns and job-seekers with employers seeking the same.   Prospective interns can search available jobs and internships by industry and location.   Employers are provided software to assist in managing applications received for these positions.   Only prospective interns/job-seekers provide preference information limited to field of expertise and location.   There is no other preference data utilized.   Thus, InternMatch uses only unilateral evaluation techniques not covered by the '073 Patent.

     i.   On or about February 25, 2013, Lumen sent InternMatch a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that InternMatch was infringing the '073 Patent.   The letter further demanded that InternMatch pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.   All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that InternMatch was not actually infringing the '073 Patent.

    ii.   Lumen granted InternMatch two extensions of time (and an additional two months) to file a responsive pleading.   On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from InternMatch.   Lumen did so because it did not want InternMatch to challenge its pleading and expose its frivolous claims.   Lumen did not believe it could prevail on the merits of the lawsuit.

iii.   On information and belief, InternMatch finally convinced Lumen that it was financially unable to pay a "license fee."

iv.   This lawsuit was voluntarily dismissed without prejudice by Lumen on May 16, 2013.   On information and belief, it was dismissed because Lumen decided it could not extort a "license fee" from InternMatch and because Lumen had no desire to obtain an injunction preventing InternMatch from engaging in the conduct Lumen alleged infringes the '073 Patent.  On information and belief, Lumen plans to re-file the lawsuit if and when Defendants are able to extort a payment from InternMatch.

m.   *Lumen View Technology LLC v. CareerArc Group LLC,* Case No. 1:2013-cv-00392 (D.Del. 2013).   CareerArc Group, which consists of Internships.com, TweetMyJobs, and CareerBeam, utilizes social and mobile networks to connect employers with job and internship seekers.   Connections are made by allowing job seekers to search for available positions by entering preference data – limited to job role, industry, and location.   Job seekers do not rank or otherwise assign value to their preference data.   Employers do not provide answers to forced choice questions and no employer preference profile is created or used to match the employer with the applicant. Thus, CareerArc performs no conjoint analysis to two preference profiles.

i.   On or about March 8, 2013, Lumen sent CareerArc a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that CareerArc was infringing the '073 Patent.  The letter further demanded that CareerArc pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous

infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that CareerArc was not actually infringing the '073 Patent.

ii. Lumen granted CareerArc an extension of time to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from CareerArc.  Lumen did so because it did not want CareerArc to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

iii. On information and belief, CareerArc decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent, because the "licensing fee" was far less than what it would spend fighting the frivolous lawsuit and far less than the costs it would incur as a result of the business disruption caused by fighting Lumen's claims.   On information and belief, CareerArc paid defendants the extorted payment on or about April 30, 2013.

iv. This lawsuit was voluntarily dismissed with prejudice by.

n. *Lumen View Technology LLC v. Burning Glass International Inc.*, Case No. 1:2013-cv-00758 (D.Del. 2013). Burning Glass Technologies, Inc. ("Burning Glass") provides services to employers searching to fill job vacancies.  The company employs patented artificial intelligence to analyze people and their careers in relation to others and present likely developments including what kind of career transitions a given employee

29.

or candidate is likely to make, and what skills they will need along the way, among others.  Burning Glass does not create preference profiles from forced choice questions.  Rather, it "reads, analyzes, and catalogs information directly from resumes and job postings" using "Statistical Natural Language Processing (SNLP)" and projections based on the data collected.  It does not use any rankings by the applicant or employer to create utility values and does not apply a conjoint analysis to two preference profiles.

    i.   On or about May 2, 2013, Lumen sent Burning Glass a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Burning Glass was infringing the '073 Patent.  The letter further demanded that Burning Glass pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Burning Glass was not actually infringing the '073 Patent.

    ii.   Lumen granted Burning Glass two extensions of time (and an additional two months) to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Burning Glass.  Lumen did so because it did not want Burning Glass to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

    iii.   On information and belief, Burning Glass decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent,

because the "licensing fee" was far less than what it would spend fighting

the frivolous lawsuit and far less than the costs resulting from the business

disruption caused by fighting Lumen's claims.  On information and belief,

Burning Glass paid defendants the extorted payment on or about August 2,

2013.

    iv.   This lawsuit was voluntarily dismissed with prejudice by Lumen.

    o.   *Lumen View Technology LLC v. Evolv Inc.*, Case No. 1:2013-cv-00943
(D.Del 2013).    Evolv helps solve workforce performance issues for corporate
management by utilizing a configurable cloud services platform.  This patent-pending
technology platform unifies and supplements existing data from current systems, then
utilizes that dataset to identify fact-based workforce insights to increase returns on
personnel investment.  Evolv does not create preference profiles based on forced choice
questions and does not apply a conjoint analysis of two or more preference profiles.  The
technology merely analyzes existing data and provides insights into the data.

    i.   On or about May 25, 2013, Lumen sent Evolv a demand letter by mail or

fax, intentionally misrepresenting the scope of the '073 Patent and falsely

stating that Evolv was infringing the '073 Patent.  The letter further

demanded that Evolv pay a "license fee" and detailed the high cost and

substantial business disruption that fighting Lumen's frivolous

infringement claim would cause.  All Defendants knew of this letter and

authorized it and all Defendants knew, at the time it was sent, that Evolv

was not actually infringing the '073 Patent.

31.

    ii.  Lumen granted Evolv an extension of time to file a responsive pleading. On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from Evolv.  Lumen did so because it did not want Evolv to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

    iii.  This lawsuit was voluntarily dismissed without prejudice by Lumen on October 3, 2013.  On information and belief, it was dismissed after Defendants learned of the filing of the present action and in an effort to hide their conduct and minimize their exposure.

p.    *Lumen View Technology LLC v. Ness Computing Inc*., Case No. 1:2013-cv-00966 (D.Del 2013).  Ness Computing is a personal search company that created the Ness Dining App (for iPhone), which provides users with recommendations for dining. The company utilizes technology that is a combination of a recommendation engine that uses machine learning to look at data from diverse sources and a traditional search engine that serves up results based on these signals.  Based on a user's ratings and preferences, the service will deliver recommendations for a particular time, location, price range, and cuisine preference.  Ness Computing uses only one preference profile from the user.  It does not create a preference profile for restaurants.

    i.  On or about May 30, 2013, Lumen sent Ness Computing a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Ness Computing was infringing the '073 Patent. The letter further demanded that Ness Computing pay a "license fee" and

detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause. All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Ness Computing was not actually infringing the '073 Patent.

    ii. After Defendants filed this lawsuit, Ness Computing's CFO, Betty Kayton, informed Lumen that it was "pre-revenue" and could not pay Lumen View's demand. Seeing no chance to extort a large "license fee," Defendants simply dropped their lawsuit.

    iii. This lawsuit was voluntarily dismissed without prejudice by Lumen on June 27, 2013. On information and belief, it was dismissed because Lumen decided it could not extort a "license fee" from Ness Computing and because Lumen had no desire to obtain an injunction preventing Ness Computing from engaging in the conduct Lumen alleged infringes the '073 Patent. On information and belief, Lumen plans to re-file the lawsuit if and when Defendants are able to extort a payment from Ness Computing.

    q. *Lumen View Technology LLC v. Monster Worldwide Inc.*, Case No. 1:2013-cv-01043 (D.Del. 2013). Monster Worldwide Inc. is the parent company of Monster ("collectively "Monster"), a leading employment solution for people seeking jobs and employers seeking employees. Prospective employees can search for jobs by job titles, keyword searches, and location. Likewise, employers can search for applicants through a qualification search. Neither party answers forced choice questions or ranks responses to such questions and Monster does not apply a conjoint analysis to two

33.

preference profiles (*e.g.* match employers and employees based on ranking of preferences).

     i.  On or about June 10, 2013, Lumen sent Monster a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Monster was infringing the '073 Patent.  The letter further demanded that Monster pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Monster was not actually infringing the '073 Patent.

    ii.  Lumen granted Monster an extension of time to file a responsive pleading and, on information and belief, during this time dropped the amount of its "license fee" in an effort to convince Monster not to fight its frivolous lawsuit.  On information and belief, Lumen did so because it did not want Monster to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

   iii.  Monster initially refused to surrender to Lumen's demands and filed an answer to Lumen's complaint.

   iv.  On information and belief, once it became apparent that Lumen would have to prove its case and would not prevail on its extortion scheme, Lumen significantly reduced its "license fee."  On information and belief, Monster paid the "license fee" because it was far less than the litigation costs and the costs it would incur from the business disruption caused by

fighting Lumen's claims.   On information and belief, Monster paid defendants the extorted payment on or about August 30, 2013.

    v.  Lumen dismissed this lawsuit with prejudice.

    r.    *Lumen View Technology LLC v. Jobvite, Inc.*, Case No. 1:2013-cv-01179 (D.Del. 2013).   Jobvite, Inc. provides software solutions to employers in order to facilitate the search for a perfect candidate for the available position, even if that individual is not actively looking for a new job.  Jobvite offers several tools to effectively search for qualified applicants and subsequently aid in the hiring process.  Employers can enter preference data at a variety of points, but there are no such services offered to applicants and Jobvite does not match any preferences.  Thus, Jobvite uses only unilateral preferences and there is no conjoint analysis of two preference profiles.

    i.  On or about July 2, 2013, Lumen sent Jobvite a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Jobvite was infringing the '073 Patent.  The letter further demanded that Jobvite pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Jobvite was not actually infringing the '073 Patent.

    ii.  On information and belief, shortly before Jobvite's responsive pleading was due, Lumen dropped the amount of its "license fee" in an effort to convince Jobvite not to fight its frivolous lawsuit.  On information and belief, Lumen did so because it did not want Jobvite to challenge its

pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

    iii.  Jobvite initially refused to surrender to Lumen's demands and filed an answer to Lumen's complaint.

    iv.  On information and belief, Lumen again lowered the amount of its "license fee" and Jobvite decided to pay the "license fee" because the cost of doing so was far less than the cost it would have incurred fighting the lawsuit or the costs it would incur from the business disruption caused by fighting Lumen's claims.   On information and belief, Jobvite paid defendants the extorted payment on or about October 2, 2013.

    v.  Lumen dismissed the lawsuit with prejudice.

s.  *Lumen View Technology LLC v. TheLadders.Com, Inc.*, Case No. 1:2013-cv-01184 (S.D.N.Y. 2012)  TheLadders is a job matching service that is aimed at assisting career-driven professionals in finding jobs that are suitable for their career goals.  Job seekers can search for jobs using various search fields and, likewise, employers can search for applicants.  Neither the job seekers nor the employers rank their preferences.  As such, TheLadders does not have the ability to determine a utility value from the parties' responses or match the two parties based on a utility value.

    i.  On or about February 21, 2013, Lumen sent TheLadders a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that TheLadders was infringing the '073 Patent.  The letter further demanded that TheLadders pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's

frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that TheLadders was not actually infringing the '073 Patent.

ii.  Lumen granted TheLadders an extension of time to file a responsive pleading.  On information and belief, during this time, contrary to the representations Lumen made in its demand letter, Lumen reduced the "license fee" it demanded from TheLadders.  Lumen did so because it did not want TheLadders to challenge its pleading and expose its frivolous claims.  Lumen did not believe it could prevail on the merits of the lawsuit.

iii.  On information and belief, TheLadders decided to pay the license fee demanded by Lumen, even though it was not infringing the '073 Patent, because the "licensing fee" was far less than what it would spend fighting the frivolous lawsuit or the costs it would incur from the business disruption caused by fighting Lumen's claims.  On information and belief, TheLadders paid defendants the extorted payment on or about April 5, 2013.

iv.  This lawsuit was voluntarily dismissed with prejudice by Lumen.

t.    *Lumen View Technology LLC v. Adicio, Inc. et al.*, Case No. 1:2013-cv-03386 (S.D.N.Y. 2013).   Adicio develops interactive classified advertising software solutions for the careers, motors, real estate, and general classifieds markets, which serve the Internet's leading media companies and web portals.  Adicio's product, MatchCast, matches an employer's jobs against resumes collected by the employer and uploaded into

the employer's database.  The software uses criteria such as the job's title, description, and requirements, to create keywords or phrases that are run against resumes.  Only employers submit "preference data" by creating job descriptions.  No other party answers forced choice questions and no second preference profile is created.  The employer does not rank its preferences.  Thus, Adicio uses only unilateral preferences and there is no conjoint analysis of two preference profiles.   Nonetheless, Lumen filed a patent infringement lawsuit against Adicio and two of its customers.

     i.  On or about May 24, 2013, Defendants sent a demand letter by mail or fax, intentionally misrepresenting the scope of the '073 Patent and falsely stating that Adicio was infringing the '073 Patent.  The letter further demanded that Adicio pay a "license fee" and detailed the high cost and substantial business disruption that fighting Lumen's frivolous infringement claim would cause.  All Defendants knew of this letter and authorized it and all Defendants knew, at the time it was sent, that Adicio was not actually infringing the '073 Patent.

    ii.  On October 16, 2013, all Defendants were dismissed without prejudice.  On information and belief, this lawsuit was dismissed after Defendants learned of the filing of the present action and in an effort to hide their conduct and minimize their exposure.

37.     For every company Defendants targeted, either with an infringement demand or a lawsuit, Defendants were aware that the target did not, in fact, infringe the '073 Patent.

38.     All of Lumen's conduct in the patent infringement lawsuits is directed by and/or done in concert with Defendants or with Defendants' consent and knowledge.  All Defendants

are aware of (and authorize) the content of the demand letters, pleadings, and the strategy used by Lumen to extort "license fees" (including threats, extensions of time, and "settlement" demands made to the targets). This is true because Dalton, DecisionSorter, and Hillcrest have no business operations and no purpose other than to aid Shapiro, Mintz, and Lumen in bringing these lawsuits and to shield Shapiro and Mintz's involvement in this scheme from the public eye (and from the targets of their extortion and fraud). These shell entities also help reduce the cost of the "war" Defendants bring against the target by reducing discovery expenses and burdens (as further described herein) and shielding Defendants from liability. They are also used to hide the "income" collected from the targets and to distribute those funds though the enterprise so that Defendants can continue to extort "license fees" in this manner and to hide the compensation Shapiro and Mintz receive from this scheme. Shapiro and Mintz are the individuals directing each of these shell entities and the "generals" managing the "war" waged on the targets.

39. Defendants use general "form" complaints in furtherance of its scheme so that each complaint is nearly identical aside from changes to the name of the defendant.[4] Even though, in all the cases, the targets' accused products/services are publically displayed on their websites, Defendants make no meaningful attempt to explain those products/services in their form complaints, but simply provide a one or two sentence generic description that can be used in multiple pleadings. In fact, Defendants do not engage in any meaningful pre-filing investigation. On information and belief, FTB alleges that, in each case, Defendants follow the same format:

---

[4] The form complaints used in the Lumen litigation are virtually the same as those used by Shapiro and Mintz in the litigation they bring through other shell entities based on other patents (as described *infra*).

39.

a.      Defendants conduct no investigation into the products or services offered by the target, but simply do a broad internet search for companies that offer any type of matching service (including unilateral matching).  Because the concept of matching two parties is as old as Adam and Eve, this general search reveals numerous company websites.

b.      Defendants then file a lawsuit against the company ("target") without conducting any further good-faith investigation into whether the target actually practices the process purportedly covered by the '073 Patent and without first notifying the target of the '073 Patent or the alleged infringement.  They do so even though publically available information demonstrates that the targets are not performing multilateral analyses of two or more party preference data.

c.      In each and every case, Defendants serve the complaint on the target with a letter stating that the target may avoid the cost of filing a responsive pleading if it is willing to pay Lumen a "licensing fee."  The letter further threatens that, if the target fights the lawsuit through "early motion practice" or otherwise, Lumen will increase its settlement demands and engage in "all motion practice as well as protracted discovery" to drive up litigation costs and disrupt its target's business.

d.      Neither Lumen's letter nor its complaint describe how the target is infringing the patent.  Rather, the letter advises the target that it should be prepared to describe its use of and revenue generated from the '073 Patent.

e.      A true and correct copy of the letter Defendants sent to FTB is attached hereto as Exhibit B and incorporated herein by reference.  This letter is virtually the same letter Defendants send to all targets.  Defendants simply change the target's name.

f.      Defendants conduct no further investigation into the target's "accused products or services" to determine how they operate and whether they actually infringe the '073 Patent even after representations by the target that its accused services or products do not practice the claimed invention.

g.      In some cases, when Defendants' targets show indications that they intend to defend themselves, Defendants (using Lumen) threaten to contact the target's customers, or add them to the litigation, which would effectively put the target out of business due to lost business and escalating indemnification costs.  In fact, in the lawsuits targeting RealMatch and Adicio, Defendants named the targets' customers in the complaint to exert greater pressure on the targets.

h.      In most cases, Defendants settle the lawsuits before any challenge to the patent's validity, any claim construction, or any discovery into Defendants' enterprise.  In fact, Defendants typically settle before the target files any responsive pleading. Defendants will offer the target unlimited extensions of time to file a responsive pleading to avoid having to participate in any litigation (pretrial conferences, initial disclosures, etc.).  If a target shows signs that it will file a responsive pleading, Defendants typically drop their "license fee" in a "last-ditch" effort to avoid "full-scale litigation."  This is intentional to avoid disclosing the ownership and relationship among Defendants and to prevent exposure of Defendants' RICO enterprise.

i.      In the rare case where targets are forced to engage in discovery, Defendants intentionally obscure information about their conduct and the RICO enterprise.  For example, in response to certain discovery requests made by FTB, Lumen claimed that it does not possess requested documents and that they are in the possession

41.

of Dalton.  In response to a subpoena to Dalton seeking the same documents, Dalton claims that the documents "are obtainable from some other source that is more convenient, less burdensome, or less expensive…" than Dalton.  Specifically, Dalton points back to Lumen.  In this manner, Defendants abuse the legal process to cloak their illegal conduct and, again, drive up their targets' legal fees and costs.

40.     In reality the threats made by Defendants (through Lumen) are as hollow, false, and misleading as are the allegations in their complaints.  Defendants have no good faith belief that the target is actually infringing the '073 Patent, have no desire to restrain the target from operating in the manner Defendants allege infringes the '073 Patent, have no intention of engaging in "full-scale litigation" to enforce their purported rights under the '073 Patent, and will not increase their settlement demand if the target responds to the complaint or engages in early motion practice.  In fact, despite these representations, in the case of FTB, Defendants' settlement demand remained the same after FTB filed an answer to the complaint.  And as a last-ditch effort to avoid having to defend its infringement position, Lumen offered a "one-day-only" settlement offer that was discounted by $30,000 if FTB would not file an answer to the complaint.

41.     Contrary to their threats of "full-scale litigation," Defendants are so afraid to litigate their patent infringement claims that they frequently offer their targets multiple extensions to filing a responsive pleading and, on information and belief, reduce their "license fee" so that the targets do not file an answer or otherwise challenge the complaint.  This also allows Lumen to voluntarily dismiss their lawsuit under Federal Rule of Civil Procedure, Rule 41, without exposing their frivolous claims should a target persist in refusing the Defendants' extortion efforts.

42.     On information and belief, Shapiro and Mintz have also used other "shell entities" such as Blackstone River, LLC, NewsGems LLC, Gooseberry Natural Resources LLC, Vertigo Holdings LLC, Kolomoki Mounds LLC, to bring frivolous patent infringement lawsuits based on other patents they own or in which they hold an economic interest and extort license fees or settlements (to which they are not entitled) from their victims.  For example, Shapiro and Mintz used these entities to bring patent infringement lawsuits based on their claimed right to at least three other broad patents.  Two of these patents also purport to cover systems and methods for facilitating bilateral and multilateral decision-making and the third purports to cover the basic concept of generating a news or press release online.  Using these vague patents and shell companies, Shapiro and Mintz have filed a dozen lawsuits against multiple parties over the past three to four years.  On information and belief, Shapiro and Mintz use the same pattern and techniques they use in the patent infringement cases brought in Lumen's name.  On information and belief, most (if not all) of these lawsuits were dismissed by Shapiro and Mintz's shell entities after extorting "licensing fees" from their victims.

43.     Defendants have no purpose by their demands and lawsuits other than to extort money from their victims.  They have no interest in obtaining an injunction prohibiting their targets from engaging in the activity they contend infringes the '073 Patent.  This is because the targets are not actually using any method covered by the '073 Patent.  In response to discovery propounded by FTB in the patent infringement lawsuit, Lumen expressly stated that it had no intent to, and would not, seek an injunction prohibiting FTB from its alleged infringement of the '073 Patent.  Lumen explained that, for this reason, it did not include a request for injunctive relief in the Prayer for Relief of its Complaint.  It further stated that it included allegations (at paragraph 17 of its Complaint) that Lumen would be irreparably harmed unless FTB's

"infringement" was enjoined, only because the "model" form provided by Federal Rule of Civil Procedure Appendix of Forms, Form 18, contained similar language.  Defendants' (using Lumen) plead the exact same language in all of their patent infringement complaints (changing only the name of the target) and do not include a request for injunctive relief in the Prayer for Relief.  On information and belief, they do so only because of Form 18; they have no intent or desire to obtain an injunction against any of their targets.  This is further demonstrated by the fact that, when their targets fail to file a timely answer or inform Defendants that they have no money to fight the lawsuit or pay the "license fee," Defendants simply dismiss their lawsuit rather than seek an injunction to prohibit the alleged infringing conduct.  This is because Defendants do not use the inventions claimed in the '073 Patent and have no real business or competitive interest in deterring infringement of the '073 Patent.  They maintain the '073 Patent for the sole purpose of filing lawsuits.

44.     If, *after filing the patent infringement lawsuit*, a target can prove to Defendants that it does not have the financial ability to pay a "license fee," Defendants (using Lumen) voluntarily dismiss their complaint against the target *without* prejudice and without taking any steps to enjoin the alleged use of their patent (as was done in its lawsuits against Ness Computing, Mom Corps, SnagAJob, Careerimp, Couchsurfing, and InternMatch).   On information and belief, Defendants intends to file another lawsuit against these entities when Defendants can wrongfully extract money from them.

45.     Because Lumen exists for no purpose other than to file patent infringement lawsuits, it can wage a one-sided war on its victims.  Specifically, unlike its targets, Lumen faces no disruption to its business as a result of the lawsuits.  Lumen, DecisionSorter, Dalton and Hillcrest have no legitimate business.  Therefore, they do not have business records, employees,

offices or operations.  Accordingly, they have no employees inconvenienced by, and no business disrupted by, subpoenas, discovery, document preservation, depositions, or other incidents of litigation.  Since Defendants do not manufacture or produce anything, they have no fear of counter infringement claims.  Moreover, because of the "shell game" Defendants play, Lumen has far fewer documents and witnesses to produce and it has no concern regarding its reputation in the marketplace.  Thus, Lumen faces far fewer litigation costs than its victims.  Since Lumen is undercapitalized and holds no "real" assets, its victims have little recourse.

46.    In responses to discovery propounded by FTB in the patent infringement lawsuit, Lumen repeatedly claims not to have information responsive to the requests because Lumen "is not an inventor [or] applicant" and was "formed after issuance of the patent-in-suit."  Despite this claim, the remaining Defendants refuse to cooperate with discovery and point back to Lumen.  For example, in response to certain discovery requests, Lumen claims that it does not possess requested documents and that they are in the possession of Dalton.  In response to a subpoena to Dalton seeking the same documents, Dalton claims that the documents "are obtainable from some other source that is more convenient, less burdensome, or less expensive…" than Dalton.  Specifically, Dalton points back to Lumen.

**C.    Defendants File a Frivolous Lawsuit Against FTB to Extort Illegal Fees.**

47.    FTB owns and manages the website FindTheBest.com.  The website is a research hub that provides consumers with unbiased, data-driven comparisons of a wide array of search topics ranging from subjects such as smartphones, cars, and ski resorts, to name a few.

48.    Importantly, FTB's website provides only unilateral matching because only one party – the consumer visiting the website – inserts preferences.  The website then uses available information to match consumers with products/services matching their preferences.  The FTB

website organizes available information into categories (smartphones, cars, ski resorts) that the consumers can then filter through. Consumers do not rank or otherwise assign value to their choices and, therefore, FTB cannot and does not determine a utility value consumers place on their preferences. Nor does FTB match consumers to products/services based on a utility value they place on their preferences. And since only consumers create preferences, FTB does not apply a conjoint analysis to two preference profiles to compute a closeness-of-fit value. FTB simply matches consumers to products/services based only on one party's preferences (unilateral decision-making). Functionally, FTB's website provides consumers information similar to Consumer Reports, which first offered its services online in 1987. FTB's services are public and transparent. There is no indication anywhere that FTB offers bilateral or multilateral preference matching, as is required to infringe the '073 Patent.

49.     On or about May 30, 2013, FTB received a threatening letter from Lumen's attorney (acting on behalf of all Defendants and at the direction of Shapiro and Mintz) enclosing a complaint that Lumen filed against FTB alleging infringement of the '073 Patent (*Lumen View Technology LLC v. Findthebest.com, Inc.*, Case No. 13-CV-3599 (S.D.N.Y.).

50.     Lumen's letter stated that FTB's "AssistMe feature meets one or more claims of the '073 Patent" and that the enclosed complaint had already been filed in the Southern District of New York.

51.     The letter further advised that a response to the complaint must be filed within 21 days but, "If Company is interested in avoiding the need for filing a responsive pleading, you must contact us (prior to the date of Company's Response) to discuss license terms."

52.     To create a sense of urgency, the letter falsely represented that the complaint was already served on the company's New York registered agent, when in truth it was served weeks later on FTB's Chief Marketing Officer.

53.     The letter threatened that if FTB did not immediately pay Lumen a "licensing fee," Lumen would use the litigation process to disrupt FTB's business and increase expenses for FTB.  Specifically, the letter threatened "full-scale litigation" and "all motion practice as well as protracted discovery" if FTB chose to defend the litigation rather than pay a licensing fee.  The letter also warned that, if FTB "engage[d] in early motion practice," Lumen would "likely increase Plaintiff's settlement demand."  It went on to state:  "Please be advised that for each nondispositive motion filed by Company, Plaintiff will incorporate an escalator into its settlement demand to cover the costs of its opposition papers and argument."

54.     To further intimidate FTB, the letter outlined the disruption to FTB's business that would result if FTB refused to immediately pay the licensing fee.  The letter broadly described electronically stored information ("ESI") and demanded that FTB take steps to preserve all "accessible and *inaccessible* ESI … without limitation, from six (6) years prior to the date of the filing of the Suit up to the present time, and ongoing, in any way relating to the products implicated by" Defendants' demand.   (Exh. B (emphasis added).)   Lumen also demanded that FTB take steps to prevent alteration and erasure of virtually all data and information FTB keeps or creates in operating its business, including "information *unrelated to the Suit* that [employees, officers or others] regard as personal, confidential or embarrassing." The letter even recommended "confiscating" and "sequestering" electronic devices owned by "certain individuals with significant knowledge of Company's products…."  In other words, the letter made it clear that, if FTB fought Lumen's baseless patent infringement lawsuit, Lumen

47.

would ensure that FTB's key employees would be wrapped up in the litigation causing serious disruption to FTB's business.

55.     The letter further demonstrates that Defendants use the discovery process, not to investigate and prove their patent infringement claims, but to merely harass, intimidate, injure and annoy FTB (and their other targets).

56.     The message Defendants intend to convey by this letter is that FTB (and other targets) should settle or pay the licensing fee without a fight, not because Lumen's claims are meritorious, but because Lumen will use the litigation process to cause significant financial hardship and disruption to FTB's (and other targets') business.

57.     The letter Lumen sent to FTB and the complaint filed by Lumen are nearly identical to those sent to, and filed against, other targets of its '073 Patent infringement lawsuits.

58.     The complaint Lumen filed against FTB is objectively baseless as no reasonable person could determine after a review of publically available information that FTB infringes the '073 Patent.  It is obvious from FTB's website that FTB does not use bilateral or multilateral decision-making because only one party enters preferences (unilateral decision-making).

59.     On information and belief, FTB alleges that at all relevant times Defendants knew that FTB was not infringing the '073 Patent.

60.     Shortly after receiving Lumen's Complaint, FTB's Chief Executive Officer ("CEO") and Director of Operations ("DO") contacted Lumen's attorney listed on the complaint to discuss the recently filed lawsuit and gain a better understanding of why Lumen believed FTB was infringing the '073 Patent.

61.     During the discussion, it became apparent from statements made by Lumen's attorney that the Complaint was filed without probable cause and for the sole purpose of extorting illegal "licensing fees" or a "nuisance settlement" from FTB.

62.     When asked what research or due diligence was done to that prompted the claims against FTB, Lumen stated that FTB " should trust that [Defendants] have done proper due diligence," but could not give any specifics when pressed for details.

63.     Lumen's attorney lacked any understanding of the publicly-available manner in which FTB's website operated and could give no factual explanation for why he believed FTB infringed the '073 Patent.

64.     Lumen's attorney could not explain, and lacked even a basic understanding of, the process purportedly covered by the '073 Patent.

65.     FTB's DO explained in that conversation that FTB did not in any way use a *bilateral or multilateral process*.  However, Lumen's attorney refused to discuss the merits of Defendants' infringement claim and simply reiterated Lumen's position that FTB would have to pay "licensing fees" to avoid costly litigation.

66.     Because the DO's conversation with Lumen conveyed that Lumen's goal was only to extract a payment regardless of the merits of the infringement claim, FTB's CEO subsequently telephoned Shapiro and left a message explaining who he was and stating that he was calling to gain a better understanding of the claims alleged against FTB and the '073 Patent.

67.     After leaving a second voicemail message, Shapiro returned the CEO's call.  In that conversation, Shapiro would only confirm that she was the co-inventor of the '073 Patent but claimed to no longer own the patent.

49.

68.     Shortly thereafter, Lumen's attorney contacted FTB's counsel and stated that its CEO called Shapiro a "patent troll."  According to Lumen's attorney, acting at the direction of Defendants, calling someone a "patent troll" constituted a "hate crime" under "Ninth Circuit precedent."  Lumen's attorney then represented that Lumen and Shapiro would report FTB to Judge Cote and pursue criminal charges unless: (1) the CEO apologized to Shapiro; (2) FTB financially compensated Shapiro; (3) FTB financially compensated Lumen's attorney; and (4) FTB settled the civil patent infringement lawsuit by paying a licensing fee.  The attorney further stated that the offer of the licensing fee was good until close of business that day.   On information and belief, Lumen's attorney was acting at the direction of Defendants to conduct their enterprise affairs.

69.     These threats were made in bad faith, with knowledge that neither FTB nor its CEO committed a crime.  The threats were made for the purpose of intimidating FTB and its CEO and extorting money from FTB.  This threat of criminal prosecution had no reasonable relevance to the patent infringement lawsuit, was extraneous to the action, and in no way furthered the ends of justice.

70.     On or about July 11, 2013, Lumen attended a pretrial conference in the patent litigation it filed against FTB.  During that pretrial conference, Lumen knowingly misrepresented to the Court and FTB that Monster had taken a license to the '073 Patent.  This misrepresentation was made knowingly and intentionally in an effort to pressure FTB to concede to Defendants' extortion demands.  In fact, Monster did not pay a license fee to Defendants until several weeks later, on or about August 30, 2013.

71.     On or about July 24, 2013, Lumen served FTB with initial disclosures in connection with its patent infringement action against FTB.   Those disclosures further

demonstrated that Lumen's action was frivolous and that it was, in fact, filed without a good faith investigation or probable case.   Lumen names only one individual likely to have discoverable information, Jerald Dawkins.  Although Lumen later amended its initial disclosures to add the two named inventors, Lumen's counsel expressly stated that it only added the inventors in an effort to prevent FTB from communicating with those individuals.

72.     On or about August 8, 2013, FTB's CEO contacted Jerald Dawkins, who informed the CEO that he had never heard of FTB.

73.     Lumen also served FTB with Interrogatories and Requests for Production.  On information and belief, those request are "form" requests Defendants use in any patent infringement case they file in which its victim files an answer before paying a "licensing fee." On information and belief, Defendants have a template with data fields where Defendants simply input the victim's name into these form requests without any additional thought or analysis, without any regard for the local rules or specific patent rules applicable to each lawsuit, and without any consideration of the target's services or products.  As such, many of these requests are nonsensical, improper and impermissible.  For example, most (if not all) of the discovery requests served on FTB were premature and/or improper pursuant to the Local Patent Rules of the United States District Courts for the Southern District of New York, Rule 5, Local Rules of United States District Courts for the Southern District of New York, Rule 33.3 and other statutes and rules of procedure.  Accordingly, these discovery requests are simply intended to annoy and harass FTB and saddle FTB with increased litigation costs so that FTB will acquiesce to Lumen's demands and settle the frivolous lawsuit or pay illegal "licensing fees."

74.     On August 30, 2103, Lumen served FTB via email with a Disclosure of Asserted Claims and Infringement Contentions ("Infringement Contentions") as required by the Local

Patent Rules of the Southern District of New York.  Lumen's Infringement Contentions further demonstrate Defendants' failure to properly investigate before filing a patent infringement action against FTB.  Most notably, Lumen contentions are vague, identify FTB's entire "website" as the "Accused Product or Service," and provide little supporting detail.  Lumen improperly attempts to string together screenshots from different services provided by FTB as evidence of infringement.

75.     To further intimidate FTB, distract FTB from defending the patent infringement action, increase litigation expenses, and prevent FTB from taking steps to repair damage to its reputation, Defendants (using Lumen) filed a meritless motion seeking to prevent FTB from exercising its First Amendment right to speak with the media.  The motion was filed concurrently with a false declaration, which was filed by means of wire communications in interstate commerce, and which was done so at the direction of Defendants.  The motion and false declaration were filed with the intent of compelling FTB to concede to Defendants' extortion efforts.

76.     Despite its threats, Lumen has not increased its settlement demand to FTB even though FTB opted to fight its complaint.  Although Lumen's threats have continued (as described herein), Lumen has continued to demand the same settlement amount.

77.     Specifically, upon service of Lumen's complaint, Defendants offered to dismiss their patent infringement lawsuit if FTB paid an $85,000 "licensing fee."  When FTB rejected that offer and informed Lumen that it would fight the frivolous lawsuit, Lumen made a last-ditch effort to persuade FTB to "settle" by dropping its licensing fee the day before FTB's answer was due to $55,000.  Lumen stated that this "offer" was a "one-day only offer" that would expire when FTB filed its responsive pleading the next day.  On information and belief, Lumen reduced

the "licensing fee" at the direction of and/or with the knowledge of Shapiro and Mintz because Defendants have no interest in the outcome of the patent litigation, have no desire to enjoin FTB's alleged infringement, know that FTB does not infringe the '073 Patent, and do not intend to engage in "full scale litigation."

78.     Contrary to Lumen's representations that it would continue to increase its settlement demands, after FTB filed its answer to the patent infringement lawsuit, Lumen (at the direction and with the knowledge of Defendants) again offered to drop the lawsuit in exchange for an $85,000 "licensing fee."

79.     As a result of Defendants' wrongful acts, as described herein, FTB has sustained injury to its business and property, including, but not limited to, damage to its business reputation, disruption of its business affairs, loss of investment funds, increased operational costs, and expenses incurred investigating and defending FTB's frivolous claims.  FTB has diverted substantial monetary and human resources from its business to investigate Defendants' frivolous patent claims and threats of criminal misconduct, to repair FTB's reputation and loss of goodwill, to respond to Defendants' demands, and to quiet concerns over Defendants' frivolous claims.

## COUNT I
## RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
### 18 U.S.C. § 1961 *et seq.*
### (Against All Defendants)

80.     FTB re-alleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

81.     At all relevant times, FTB is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

82.     At all relevant times, Shapiro and Mintz are persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), each of whom (through an express agreement) direct the affairs of Lumen, DecisionSorter, Dalton and Hillcrest through a pattern of improper tortious acts and illegal conduct described in this Complaint, which cause financial harm to FTB and others.

83.     Lumen, DecisionSorter, Dalton and Hillcrest, in any combination associated in fact, are an "Enterprise," as defined by 18 U.S.C. § 1961(4), controlled and directed by Shapiro and Mintz, associated together in fact for the common purpose of making frivolous patent infringement demands and extorting "licensing fees" and/or settlements from individuals and entities who do not actually infringe the patent at issue.  The Defendants have a continuing and ongoing relationship that has endured for several years and has resulted in more than twenty patent infringement lawsuits enabling Defendants to extort unlawful "settlements" and "licensing fees" to which they are not entitled.

84.     Each of the Defendants participated in the operation or management of the Enterprise.   Among other things, Shapiro and Mintz direct the affairs of the enterprise, DecisionSorter, Dalton, and Hillcrest serve as "holding companies" set up to conceal Shapiro's and Mintz's involvement in the enterprise, to hide exculpatory evidence and other materials that would assist their victims in defeating the patent infringement claims, and to funnel, hide, and shield the improper financial gains that result from the Enterprise.  Lumen is the "front" of the enterprise that, acting on the direction of Shapiro and Mintz, files the litigation and carries out the threats and fraudulent conduct further described herein.

85.     At all relevant times, the Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

86.     The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

87.     Defendants' pattern of racketeering is demonstrated by the more than 20 frivolous patent infringement lawsuits it filed against various targets it knew, or would have reasonable known had it conducted an pre-lawsuit investigation, were not infringing its patent.  In each and every case, Defendants attempted to and/or successfully extorted "license fees" from the targets, committed mail fraud and violated the Travel Act.  Defendants used the same or similar techniques in each case, all of which were acts that constitute predicate acts under the RICO statute and acts the RICO statute was intended to deter.  Defendants' acts shared similar purposes, results, participants, and methods of commission.

88.     Defendants multiple acts of past criminal conduct suggests that there is a high risk Defendants will continue to engage in such conduct either against new victims or against those it has previously sued but voluntarily dismissed from lawsuits *without prejudice*.  Indeed, Lumen admits that its business purpose is to file patent infringement lawsuits based upon the '073 Patent.  Defendants' pattern and practice demonstrates that it will continue to do so regardless of whether the targets of those lawsuits are actually infringing the '073 Patent.  In each and every claim of patent infringement Lumen has asserted thus far, it has committed acts of extortion, attempted extortion, mail and/or wire fraud and violations of the Travel Act.

*Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951 and*
*California State Penal Law §§ 518, 519, 523, 524*

89.     At all times material to this Complaint, FTB was engaged in interstate commerce and in an industry that affects interstate commerce.

90.     Defendants, individually or collectively, conducted the affairs of the enterprise through numerous acts of extortion, attempted extortion and conspiracy to commit extortion in violations of 18 U.S.C. § 1951, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means.

91.     As described herein, Defendants have threatened frivolous lawsuits and criminal prosecution unless FTB paid substantial sums of money.  The Defendants did so with the intent and effect of causing a reasonable fear of economic loss on the part of FTB, to disrupt FTB's business operations, and to disrupt and encourage FTB to abandon its defense of the frivolous patent infringement lawsuit initiated by Defendants.

92.     Similarly, the Defendants' wrongfully attempted to appropriate FTB's property by instilling fear that, if the property was not delivered, the Defendants would accuse FTB and its CEO of a crime and FTB and its CEO would face additional expense, embarrassment, business disruption, damage to their reputation, and legal fees.

93.     Defendants also used litigation and the discovery process without any interest in the outcome of the litigation, but with the intent to harm FTB's business and persuade FTB to pay a "licensing fee" even though Defendants knew (or reasonably should have known) that FTB was not infringing the '073 Patent.

94.     Defendants' conduct did in fact instill fear in FTB, causing additional interruptions to FTB's business, causing the harm Defendants so intended, including additional legal fees, disruption to FTB's business, increased operational costs, decreased productivity, injury to FTB and its CEO's reputation, and disruption of FTB's defense to Lumen's patent infringement complaint.

*Mail Fraud, 18 U.S.C. 1341 and Wire Fraud, 18 U.S.C. § 1343*

95.     As described herein, the Defendants engaged in a scheme to defraud and extort substantial sums of money and property from FTB.

96.     In furtherance of their scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme.

97.     Specifically, Defendants delivered their threats, false representations regarding the nature of the '073 Patent, their purported right to "licensing fees," their "settlement demands," their false declaration, and their threats of criminal prosecution via wire, email, and telephone.  Defendants used the U.S. Postal Service and/or private mail carriers to deliver its letter and complaint to FTB and other victims, both of which were used to deliver threats and intimidate FTB.

98.     The Defendants participated in the scheme to defraud and extort FTB by knowingly, willfully, and threatening FTB with the specific intent to deceive and/or defraud FTB into paying the Defendants illegal "licensing fees" and settlements.

99.     The Defendants' false and misleading statements were relied on by FTB and have caused FTB substantial damages, as further described herein.

*Travel Act, 18 U.S.C. 1952*

100.     As described herein, the Defendants engaged in a scheme to defraud and extort substantial sums of money and property from FTB.

101.     Defendants used the mail system, telephone and internet with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying

on" their racketeering activity, including their unlawful scheme of extorting money from FTB and other targets and delivering false threats and misrepresentations to FTB and others.

102.    On information and belief, Defendants have also traveled in interstate commerce with the intent and for the purpose of carrying out racketeering activity, including their unlawful scheme of extorting money from FTB and other targets.

103.    Defendants attempted to, and did in fact, commit various acts of extortion, mail fraud and wire fraud in violation of state and Federal law, as described in more detail herein.

104.    Each of the Defendants have engaged in multiple predicate acts, as described herein, not only against FTB but other victims as well.  The conduct of each of the Defendants constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

105.    FTB was injured in its business and property by reason of the Defendants' pattern of racketeering activity violating 18 U.S.C. § 1962(c).  The injuries to FTB caused by reason of the violations of 18 U.S.C. § 1962(c) include, but are not limited to, damage to FTB's reputation and goodwill, disruption to FTB's business, travel expenses, legal fees and costs in defending itself from Defendants' objectively baseless, improperly motivated, sham patent lawsuit and threats of criminal prosecution.   Among other things, FTB's executives have devoted approximately 500 hours of their time investigating Defendants' frivolous claims of patent infringement and criminal conduct, taking steps to repair FTB's reputation and goodwill that was damaged as a result of Defendants' conduct, defending and responding to demands Defendants made in connection with its claims, and quieting concerns regarding Defendants' claims. Additionally, FTB has spent three hours in "all company meetings" to address its employees' concerns regarding Defendants' claims, which total approximately 300 hours.  FTB's engineers have also devoted significant time to investigating, defending, and responding to Defendants'

frivolous claims.  All these efforts have diverted significant resources from the operation of FTB's business, which was Defendants' purpose and intent, hindering the time FTB's executives and engineers can devote to developing products and services to compete in a highly competitive industry.  Moreover, as FTB is a "start-up" company (as are most of Defendants' targets) Defendants' assault comes at a particularly crucial time where any diversion of the company's economic and human capital is critical to the company's success.  All in, this diversion of resources has cost FTB in excess of tens of thousands of dollars.

106.    Further, these injuries to FTB were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Indeed, these are the very type of damages Defendants threatened to inflict upon FTB if it did not comply with its extortion demands.  FTB has been and will continue to be injured in its business and property in an amount to be proven at trial.

107.    Pursuant to 18 U.S.C. § 1964(c), FTB is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

108.    FTB seeks a permanent injunction to enjoin the Defendants from filing any more frivolous patent infringement lawsuits.

## COUNT II
## CONSPIRACY TO VIOLATE RICO (18 U.S.C. 1962(d))
### (Against All Defendants)

109.    FTB re-alleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

110.    Defendants Shapiro, Mintz, DecisionSorter, Dalton and Hillcrest, individually and collectively conspired with Lumen to commit wire fraud, extortion and violate the RICO statute as described herein.

111.    FTB was injured in its business and property by reason of the Defendants' pattern of racketeering activity violating 18 U.S.C. § 1962(c).  The injuries to FTB caused by reason of the violations of 18 U.S.C. § 1962(c) include, but are not limited to, damage to FTB's reputation and goodwill, disruption to FTB's business, travel expenses, legal fees and costs in defending itself from Defendants' objectively baseless, improperly motivated, sham patent lawsuit and threats of criminal prosecution.   Among other things, FTB's executives have devoted approximately 500 hours of their time investigating Defendants' frivolous claims of patent infringement and criminal conduct, taking steps to repair FTB's reputation and goodwill that was damaged as a result of Defendants' conduct, defending and responding to demands Defendants' made in connection with its claims, and quieting concerns regarding Defendants' claims. Additionally, FTB has spent three hours in "all company meetings" to address its employees' concerns regarding Defendants' claims totaling approximately 300 hours.  FTB's engineers have also devoted significant time to investigating, defending, and responding to Defendants' frivolous claims.  All these efforts have diverted significant resources from the operation of FTB's business, which was Defendants' purpose and intent, hindering the time FTB's executives and engineers can devote to developing products and services to compete in a highly competitive industry.   Moreover, as FTB is a "start-up" company (as are most of Defendants' targets) Defendants' assault comes at a particularly crucial time where any diversion of the company's economic and human capital is critical to the company's success.   All in, this diversion of resources has cost FTB in excess of tens of thousands of dollars.

112.    Further, these injuries to FTB were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Indeed, these are the very type of damages Defendants threatened to inflict upon FTB if it did not comply with its extortion

demands. FTB has been and will continue to be injured in its business and property in an amount to be proven at trial.

113.    Pursuant to 18 U.S.C. § 1964(c), FTB is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

### COUNT III
### EXTORTION
### (Against all Defendants)

114.    FTB re-alleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

115.    As set forth *supra*, Defendants agreed to accomplish the unlawful purpose of commencing frivolous patent infringement actions against FTB and others, without probable cause or a good faith investigation for the purpose of extracting money from FTB and these other victims.

116.    As part of this agreement, Shapiro and Mintz transferred their rights to the '073 Patent to the "shell entities," DecisionSorter, Dalton, and Hillcrest, and then to Lumen to allow Lumen to initiate a litigation campaign. At all times the Defendants had an agreement that the illegal funds obtained through this scheme would be distributed back into the enterprise so that it could continue its extortion campaign and the net proceeds would be collected for Shapiro and Mintz. Defendants agreed that Shapiro and Mintz would maintain a secret interest in the '073 Patent.

117.    The agreement and scheme created by Defendants constitutes fraud and extortion and is contrary to public policy.

118.    Defendants used the process of this Court for the collateral purpose of extorting money from FTB and others because at no time did Defendants have any desire to deter or enjoin

any alleged patent infringement or protect their purported rights to the '073 Patent.  Defendants did not believe (or did not reasonably believe) that FTB was, in fact, infringing the '073 Patent.

119.    Despite threats of criminal prosecution, Defendants had no good faith belief that FTB or its CEO committed any crime, but simply used this threat in an effort to extort funds from FTB.

120.    As a proximate result of the actions taken by Defendants, FTB has suffered disruption to its business, loss of productivity, loss of business goodwill, substantial litigation expense, additional operation expenses, decreased productivity, and other damages in an amount to be proven at trial.

### COUNT IV
### ABUSE OF PROCESS
### (Against All Defendants)

121.    FTB re-alleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

122.    Defendants entered into an agreement and created "shell entities" and license agreements for the purpose of commencing patent infringement actions against FTB and others, based on a vague patent for the purpose of extracting money from FTB and other victims.

123.    At all times, Defendants did not intend to enjoin infringement of the '073 Patent and did not use the process to do so, or in any way protect the '073 Patent.  Lumen has admitted that it had no intent to seek an injunction prohibiting FTB from using the '073 Patent. Defendants used the process of this Court to extort money from FTB and others and to harm FTB's business.

124.    Defendants also used the discovery process to harass, annoy, injure and intimidate FTB, rather than to actually discover information relevant to their patent infringement claims or to prove their claims.

125.    Defendants have engaged in litigation misconduct involving unethical and/or unprofessional conduct by them and/or their attorneys during the course of adjudicative proceedings, including advancing frivolous arguments during the course of the litigation, making false threats of criminal prosecution and sanctions, or otherwise prolonging litigation in bad faith.

126.    As a proximate result of the actions taken by Defendants, FTB has suffered disruption to its business, loss of productivity, loss of business goodwill, substantial litigation expense, additional operation expenses, decreased productivity, and other damages in an amount to be proven at trial.

**COUNT V**
**CIVIL CONSPIRACY**
**(Against all Defendants)**

127.    FTB re-alleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

128.    Defendants Shapiro and Mintz formed an agreement for the purposes of engaging in a nationwide pattern and practice of baseless threats, fraud, misrepresentations, unfair competition, and extortion from businesses and individuals, including FTB.

129.    Each Defendant participated in, contributed to, and substantially assisted one another in the commission of the wrongful conduct described herein, including violation of RICO, abuse of process, extortion and violation of Cal. Bus. & Prof. Code § 17200.

130.    In furtherance of that conspiracy, Shapiro and Mintz formed DecisionSorter, Dalton, Hillcrest, and Lumen (all "shell entities" that are undercapitalized) and created and/or executed various licensing agreements between themselves and those entities so that Lumen could serve as the vehicle for filing frivolous and unfounded patent infringement lawsuits and delivery unsubstantiated and absurd threats (including threats of criminal prosecution) for the purpose of extorting money from FTB, and others.

131.    Through these unlawful acts, as further described herein, Defendants have damaged FTB by causing FTB to expend substantial sums investigating, defending and preparing to defend against fraudulent and baseless threats and claims; disrupting FTB's business operations, its goodwill and business reputation, and other damages to be proven at trial.

<div align="center">

**COUNT VI**
**CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.**
**(Against All Defendants)**

</div>

132.    FTB re-alleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

133.    Defendants' conduct described herein constitutes unfair, unlawful and/or fraudulent business acts or practices under Cal. Bus. & Prof. Code § 17200 et seq., including for example, but not limited to, making affirmative misrepresentations and omissions about the need to take a license to the '073 Patent, the alleged scope of the '073 Patent, and the characterization of FTB's CEO's alleged statement to Shapiro as "a hate crime"; engaging in a broad scheme to use fear in an effort to extort license fees for amounts to which Defendants were not entitled; filing frivolous patent infringement actions; threatening Defendants with unfounded claims of criminal prosecution; and abuse of process and violations of RICO, as alleged above.

134.   Misconduct and injuries pertaining to the conduct referenced herein have occurred within California, either of which gives rise to a § 17200 claim.   With respect to injury in California, FTB's principal place of business is in California.   Thus, the disruption to FTB's business caused by Defendants' misconduct occurred in California as did its damages.   With respect to misconduct, Defendants' letter demanding "licensing fees" was sent to FTB in California and Defendants' threats were made to FTB in California.

135.   As a result of Defendants' conduct, as described herein, FTB's business was disrupted, as its officers, directors and key employees had to devote significant time and resources to defend FTB from Defendants' frivolous and false claims.   This diverted much need capital from FTB's business operations at a critical point of the start-ups operation, stifling competition in an emerging industry.   Plaintiff also suffered damage to its business goodwill and reputation.

136.   Plaintiff is entitled to remedies, including a permanent injunction barring continued commission of the unlawful activities alleged herein, and restitution.

## PRAYER FOR RELIEF ON FTB'S COMPLAINT

WHEREFORE, FTB prays for the following relief against Defendants on FTB's Complaint, as follows:

1.   For judgment in favor of FTB on all claims;

2.   For general damages according to proof at trial,

3.   For restitutionary damages;

4.   For trebled damages according to statutes, 18 U.S.C. § 1964(c);

5.    For pre-judgment interest according to statute;

6.    For FTB's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c);

7.    For injunctive relief;

8.    For such other legal and equitable relief as the Court may deem FTB is entitled to receive.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: November 22, 2013                    Respectfully submitted,

By: *Joseph S. Leventhal* rce

JOSEPH S. LEVENTHAL
(admitted *pro hac vice*)
THE LEVENTHAL LAW FIRM, APC
600 West Broadway, Suite 700
San Diego, CA 92101
Ph: (619) 356-3518
Fx: (619) 615-2082
jleventhal@leventhallaw.com

Counsel for Plaintiff
FINDTHEBEST.COM, INC.